UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Sammie Louis Stokes, | ) | Civil Action No.:  1:16-cv-00845-RBH |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| Bryan P. Stirling, *Director, South Carolina* | ) | |
| *Department of Corrections*; and | ) | |
| Willie D. Davis, *Warden of Kirkland* | ) | |
| *Correctional Institution*, | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

Petitioner Sammie Louis Stokes, a state prisoner sentenced to death and represented by counsel, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The matter is before the Court for consideration of Petitioner's objections to the Report and Recommendation ("R & R") of United States Magistrate Judge Shiva V. Hodges, who recommends granting Respondents' motion for summary judgment and denying and dismissing Petitioner's habeas petition with prejudice.[1]  The Court adopts the R & R as modified herein.

## Background[2]

In 1999 an Orangeburg County, South Carolina jury convicted Petitioner of murder, kidnapping, first-degree criminal sexual conduct, and criminal conspiracy, and he was sentenced to death for the murder conviction.[3]  The facts giving rise to these convictions are summarized in the South Carolina

---

[1]      This matter was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02(B)(2)(c) for the District of South Carolina.

[2]      The R & R thoroughly details the factual and procedural history, which the Court briefly recounts here.

[3]      Petitioner was sentenced to thirty years for first-degree criminal sexual conduct and five years for criminal conspiracy.  Because of his death sentence for murder, no sentence was imposed for the kidnapping conviction in accordance with S.C. Code Ann. § 16–3–910 (Supp. 2000).

Supreme Court's opinion rejecting Petitioner's direct appeal:

Stokes was hired by Patti[e] Syphrette to kill her daughter-in-law, 21-year-old Connie Snipes, for $2000.00. On May 22, 1998, Syphrette called Stokes and told him Connie "got to go and tonight." At 9:30 pm that evening, Syphrette and Snipes picked up Stokes at a pawn shop, and the three of them went to Branchville and picked up Norris Martin.[2] The four of them then drove down a dirt road in Branchville and stopped. Syphrette remained in the car while Stokes, Martin and Snipes walked into the woods. When they got into the woods, Stokes told Snipes, "Baby, I'm sorry, but it's you that Pattie wants dead . . . [.]"

> FOOTNOTE 2: Allegedly, Snipes accompanied the others on the premise that they were going to Branchville to kill a man named Doug Ferguson, whom Syphrette and Stokes had tied up in the woods.

According to Norris Martin, Stokes forced Snipes to have sex with Martin at gunpoint. After Martin was finished, Stokes had sex with Snipes. While doing so, Stokes grabbed her breast and stabbed her in the chest, cutting both her nipples. Stokes then rolled her over and began having anal sex with her. When Stokes was finished, he and Martin each shot the victim one time in the head,[3] and then dragged her body into the woods. Stokes then took Martin's knife and scalped her, throwing her hair into the woods. According to Martin, Stokes then cut Snipes' vagina out.[4]

> FOOTNOTE 3: Martin testified that Stokes placed the gun into his (Martin's) hand and then pulled the trigger.

> FOOTNOTE 4: According to the pathologist, Snipes' injuries were consistent with having been scalped, had the nipple area cut from each breast, and having had the vaginal area cut out.

Snipes' body was found by a farmer on May 27th, and Martin's wallet was found in the field near it. Martin was interviewed by police the following morning, after which police went to the Orangeburg home of Pattie Syphrette's husband Poncho; by the time police arrived at the home on May 28, 1998, Stokes and Syphrette had already murdered Doug Ferguson by wrapping duct tape around his body and head, suffocating him.[5]

> FOOTNOTE 5: Stokes pleaded guilty to Ferguson's murder in a separate proceeding and was sentenced to life.

2

*State v. Stokes*, 548 S.E.2d 202, 203–04 (S.C. 2001). Attorneys Thomas Ray Sims and Virgin Johnson Jr. (collectively, "trial counsel") were appointed to represent Petitioner. In 2001, the South Carolina Supreme Court affirmed Petitioner's convictions and death sentence, denied his petition for rehearing, and remitted the case. *See id.* at 206–07; ECF Nos. 18-4 through 18-7.

Thereafter, Petitioner filed an application for post-conviction relief ("PCR") in state court and amended it twice. Attorneys Keir Weyble, Robert Lominack, and Susan Hackett (collectively, "PCR counsel") were appointed to represent Petitioner. In 2009, the state PCR court conducted an evidentiary hearing, and in 2010, it issued a written order denying and dismissing Petitioner's PCR application with prejudice. *See* App.[4] 2139–84. In 2013, the PCR court denied Petitioner's motion to alter or amend the judgment. *See* App. 2373–95. Petitioner appealed the denial of his PCR application to the South Carolina Supreme Court, which summarily denied certiorari in February 2016. *See* ECF Nos. 18-8 through 18-12. In May 2016 (after the instant § 2254 action was filed), Petitioner filed a petition for a writ of certiorari in the United States Supreme Court.[5] In December 2016, the U.S. Supreme Court denied certiorari to review the judgment of the South Carolina Supreme Court. *See Stokes v. South Carolina*, 137 S. Ct. 589 (Dec. 12, 2016).[6]

On March 9, 2016, Petitioner commenced the instant § 2254 action by filing a motion to stay his execution and a motion to appoint counsel. *See* ECF No. 1. The Court granted the motions, *see*

---

[4]     "App." refers to the appendix filed by Respondent, and it is available at ECF No. 19. The R & R cites the electronic court filing numbers ("ECF Nos."), but the Court cites the state-court appendix for the sake of clarity and brevity.

[5]     *See* ECF No. 61 at p. 3; *Stokes v. South Carolina*, Case No. 15-9329 (U.S.S.C. filed May 11, 2016), *available at* https://www.supremecourt.gov/search.aspx?filename=/docketfiles/15-9329.htm.

[6]     Also during the pendency of this § 2254 action, Petitioner filed a state habeas corpus action in the South Carolina Supreme Court, which denied Petitioner's habeas petition in March 2017. *See* ECF No. 102-1.

3

ECF Nos. 8 & 12, and Petitioner subsequently filed his § 2254 petition and a supplemental petition. *See* ECF Nos. 22, 51, & 75. Respondents answered and moved for summary judgment, *see* ECF Nos. 56, 89, 160, 161, & 175; Petitioner responded to the motion for summary judgment, *see* ECF Nos. 74, 96, & 172; and the Magistrate Judge determined an evidentiary hearing was necessary for Petitioner's *Martinez*[7] claims.[8] *See* ECF No. 101.

In January 2018, the Magistrate Judge held a four-day evidentiary hearing on the *Martinez* claims; Petitioner himself did not testify but he called other witnesses. *See* ECF Nos. 101, 195–99, & 204–07. In May 2018, the Magistrate Judge issued an R & R recommending granting Respondents' motion for summary judgment and denying and dismissing Petitioner's habeas petition with prejudice. Petitioner filed timely objections to the R & R, and Respondents filed a reply to Petitioner's objections. *See* ECF Nos. 221 & 222.

The matter is now before the Court for consideration of Petitioner's three remaining grounds for relief: Grounds Three, Six and Seven.[9] These grounds are, verbatim, as follows:

- **<u>Ground Three (exhausted claim)</u>**: "[Petitioner's] right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated as a result of representation by counsel who labored under an actual conflict of interest." ECF No. 22 at p. 9.

---

[7]     *Martinez v. Ryan*, 566 U.S. 1 (2012).

[8]     The Magistrate Judge directed the parties to participate in discovery on the *Martinez* claims, *see* ECF No. 101, and the parties took depositions of trial counsel, PCR counsel, and Petitioner's childhood trauma expert Dr. James Garbarino. *See* ECF Nos. 126, 127, 130, 131, 134, 135, & 142; *see generally* Rule 6(a) of the Rules Governing Section 2254 Cases ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure . . . ."); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991) ("A court should grant discovery in its discretion where there is 'good cause' why discovery should be allowed." (quoting Rule 6(a))).

[9]     Petitioner originally raised eight grounds for relief, but has since withdrawn Grounds One, Two, Four, Five, and Eight. *See* ECF No. 140; ECF No. 221 at p. 39 n.7.

- **Ground Six (_Martinez_ claim)**: "Trial and collateral counsel were ineffective to the prejudice of [Petitioner] by failing to investigate, develop[,] and present any mitigation evidence." ECF No. 75 at p. 5.

- **Ground Seven (_Martinez_ claim)**: "[Petitioner's] Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel offered an expert witness not suitable for the case and failed to prepare[] that witness." ECF No. 75 at p. 32.

## Legal Standards

### I.    Review of the Magistrate Judge's R & R

The Magistrate Judge makes only a recommendation to the Court. The Magistrate Judge's recommendation has no presumptive weight, and the responsibility to make a final determination remains with the Court. _Mathews v. Weber_, 423 U.S. 261, 270–71 (1976). The Court must conduct a de novo review of those portions of the R & R to which specific objections are made, and it may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

The Court must engage in a de novo review of every portion of the Magistrate Judge's report to which objections have been filed. _Id._ However, the Court need not conduct a de novo review when a party makes only "general and conclusory objections that do not direct the [C]ourt to a specific error in the [M]agistrate [Judge]'s proposed findings and recommendations." _Orpiano v. Johnson_, 687 F.2d 44, 47 (4th Cir. 1982). In the absence of specific objections to the R & R, the Court reviews only for clear error, _Diamond v. Colonial Life & Acc. Ins. Co._, 416 F.3d 310, 315 (4th Cir. 2005), and the Court need not give any explanation for adopting the Magistrate Judge's recommendation. _Camby v. Davis_,

718 F.2d 198, 199–200 (4th Cir. 1983).

## II.     Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see generally* Rule 12 of the Rules Governing Section 2254 Cases ("The Federal Rules of Civil Procedure . . . , to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules."); *Brandt v. Gooding*, 636 F.3d 124, 132 (4th Cir. 2011) ("Federal Rule of Civil Procedure 56 'applies to habeas proceedings.'" (quoting *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991))). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "The evidence must be viewed in the light most favorable to the non-moving party, with all reasonable inferences drawn in that party's favor.  The court therefore cannot weigh the evidence or make credibility determinations." *Reyazuddin v. Montgomery Cty.*, 789 F.3d 407, 413 (4th Cir. 2015) (internal citation and quotation marks omitted).

### Discussion

As indicated above, Petitioner presently seeks habeas relief on three grounds: a conflict of interest claim (Ground Three) and two *Martinez* claims (Grounds Six and Seven).[10]  The Magistrate

---

[10]      The Court refers to these grounds as originally identified in Petitioner's initial petition and supplemental petition, i.e., as Grounds Three, Six, and Seven. *See* ECF Nos. 22 & 75.

6

Judge recommends granting summary judgment on all three grounds.[11]  *See* R & R at pp. 88–120, 133–93.  Petitioner has filed objections to the R & R.  *See* Pet.'s Objs. [ECF No. 221].

## I.    Exhausted Claim—Ground Three (Conflict Claim)

Petitioner alleges in Ground Three that his "right to counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated as a result of representation by counsel who labored under an actual conflict of interest."  ECF No. 22 at p. 9.  Petitioner's conflict of interest claim arises from the undisputed fact that one of his trial counsel, Thomas Sims, had previously prosecuted him for an assault that Petitioner committed against his former wife, who testified about that assault during the sentencing phase of trial.  *See* Pet.'s Objs. at pp. 2–10; ECF No. 22 at pp. 9–23; ECF No. 51 at pp. 3–36; ECF No. 172 at pp. 7–45.

### A.    Facts

#### 1.    Thomas Sims' Prosecution of Petitioner in 1991

In January 1991 (eight years before the underlying capital trial), an Orangeburg County grand jury indicted Petitioner for assault and battery with intent to kill ("ABWIK") allegedly committed against his former wife, Audrey Smith, in December 1990.  App. 1696–97.  At the time, Thomas Sims was an assistant solicitor for the First Circuit Solicitor's Office in Orangeburg, and he signed the indictment[12] and personally prosecuted the ABWIK case against Petitioner.  App. 2396–2540.  In March 1991, the ABWIK case was called for trial before Judge John H. Smith, and Sims appeared in court on behalf of the State.  App. 2396–99.  Petitioner was also present in the courtroom accompanied by his

---

[11]    The R & R also addresses Grounds Four and Five, *see* R & R at pp. 120–33, but Petitioner withdrew these grounds in his objections.  *See* Pet.'s Objs. at p. 39 n.7.

[12]    Sims signed the indictment because he was the acting solicitor at the time.  App. 1859.

defense counsel, and before jury selection began, Petitioner waived his right to be present and voluntarily absented himself from the courtroom during trial. App. 2400–09. Ultimately, Petitioner was convicted of the lesser-included offense of assault and battery of a high and aggravated nature ("ABHAN") and sentenced to ten years' imprisonment. App. 2535–36. Sims went into private practice in 1993. App. 1505, 1860.

### 2. Sims' Representation of Petitioner at the 1999 Capital Trial

In May 1998, Petitioner committed the offenses giving rise to his capital trial, and in January 1999, the trial court (Judge M. Duane Shuler presiding) held a hearing at which it appointed Sims and Virgin Johnson Jr. to represent him. App. 1503–07. When providing his particular qualifications, Sims noted he had worked in the Solicitor's Office from 1982 until 1993, App. 1505–06, but did not inform the trial court that he had previously prosecuted Petitioner. The trial court appointed Sims as lead counsel given his prior experience in capital cases, and Johnson as second-chair counsel. App. 1503–07. At the conclusion of the hearing, the trial court noted that Petitioner was present in the courtroom and that Sims and Johnson had "talked to him ahead of time." App. 1511.

Petitioner proceeded to trial before Judge Paul Burch in October 1999, and after he was found guilty, the State introduced his criminal record as aggravating evidence during the sentencing phase. App. 1112–13. This criminal record included the aforementioned 1991 ABHAN conviction as well as a 1988 ABHAN conviction also involving Petitioner's former wife Smith, who was the victim in both offenses and testified about the facts giving rise to the convictions and several threatening letters that Petitioner had written her from prison.[13] App. 1113–45. Sims briefly cross-examined Smith, asking

---

[13] The record indicates the 19**88** ABHAN conviction is from "19**9**8," but this appears to be a typographical error in the trial transcript. *Compare* App. 1112 (solicitor reading the date as "March 9, 1998"), *with* App. 1121 (Smith testifying Petitioner "was convicted in March of th[e] assault" that had occurred in the preceding year of

her about the letters and whether Petitioner had contacted her after being released from prison in May 1998. App. 1142–44. Smith answered that Petitioner had no direct contact with her after being released from prison and that she had not received a letter from him for a couple years. App. 1142–43. Smith also acknowledged that when she and Petitioner were having problems, he was on drugs and jealous and possessive of her. App. 1143–44. Smith also confirmed that in a number of Petitioner's letters he was asking to be her friend and wanting to talk with her "about trying to get his head straight." App. 1144.

The parties agree the trial record is silent on the alleged conflict at issue, and that the trial court never inquired into the existence of any potential conflict due to Sims' prior prosecution of Petitioner. *See* ECF No. 22 at pp. 10–11; ECF No. 56 at p. 51.

### 3. PCR Evidentiary Hearing

At the 2009 evidentiary hearing before the state PCR court, Sims and Johnson testified about their representation of Petitioner and the alleged conflict of interest. App. 1857–1915.

#### a. Sims' Testimony at the PCR Hearing

Sims recalled signing the ABWIK indictment and handling Petitioner's 1991 prosecution. App. 1859–60. Sims had no further involvement with either Petitioner or Smith after the 1991 trial, and after unsuccessfully running for solicitor in 1992, he went into private practice. App. 1860–62. He remembered being appointed to represent Petitioner in 1999. App. 1862–63. When asked why he did not inform the trial court that he had prosecuted Petitioner, Sims stated "it just didn't come up." App.

---

1987).
       The State also introduced a 1993 ABHAN conviction relating to Petitioner's assault of an inmate while he was incarcerated. App. 1113. The State presented a chart—not the indictments themselves—summarizing Petitioner's criminal record. App. 1087. This procedure was used due to Sims' name being on the 1991 indictment. App. 1637.

1863. However, Sims explained he and Johnson met with Petitioner and discussed this issue; Sims testified as follows:

> Q: Do you recall meeting with Mr. Stokes and discussing if at all your prior prosecution of him?
>
> A: As I recall, after going through the information we did discuss with Mr. Stokes, my role, who I was, and what my role had been in the previous matter with him. We discussed it, me and Attorney Johnson. We did discuss it. He never expressed any desire not to have me as his attorney.
>
> . . . .
>
> Q: What was the purpose of those discussions?
>
> A: For him to know fully who I was, what was there before him, and it was in my mind that if I tell you that, you know, hey, you know who I am. I'm the one who prosecuted you, sent you to jail, do you still want me as your lawyer, and he says, yes. That also says the other side to me that if I don't want you I can say I don't want you any more.
>
> Q: But just to be clear, did you have that type of discussion with Sammie?
>
> A: We had that type of discussion in terms of, look, you know who I am. I'm the prosecutor, I was the prosecutor here. I've been here and you know who I am. I've – you and I have met before, we've been involved before.
>
> Q: So it was clear from your discussion that Sammie could have said he didn't want you as a lawyer?
>
> A: Yes.
>
> Q: Right?
>
> A: Yes.
>
> Q: And he said he wanted you to continue?

A:     Yeah.

. . . .

Q:     [F]rom your representation in January of 1999, through the trial, did your client ever indicate to you any desire to have you removed as his lawyer?

A:     None.

App. 1863–64, 1866. Sims also recalled that while Petitioner's direct appeal was pending, Petitioner called him, indicated that if the appeal succeeded he "still wanted [Sims] to be his lawyer," and said he thought Sims was "top flight." App. 1864–65.

Sims testified the State provided him information concerning the statutory aggravating circumstances and the evidence in aggravation. App. 1866. Specifically, the State notified him of its intention to call Audrey Smith as a witness and to put into evidence the 1991 ABHAN conviction as well as Petitioner's letters to Smith. App. 1867. Sims anticipated the conviction, Smith's testimony, and Petitioner's letters would be introduced at trial, and he discussed this fact "in depth" with Petitioner. App. 1867–88. Sims confirmed he knew this evidence "was coming in" and planned to address it with a showing of remorse. App. 1868. He answered questions about his cross-examination of Smith, testifying as follows:

Q:     Did the fact that you had previously prosecuted Mr. Stokes for that same incident that was part of Audrey Smith's testimony, did that affect the way that you approached her on cross-examination or any objection you may have available to you?

A:     Now, look, if I thought that I couldn't have represented Mr. Stokes to the best of my ability I would not have been in the case.

Q:     All right. And was that consideration that you had from the beginning of your appointment with Mr. Stokes being aware

that you had, in fact, prosecuted him?

A:    I take the position that if I got a conflict, if I have a moral issue, if I have an ethical issue or if I have any issue that's going to prevent me from presenting [*sic*] anyone, I will not take the case.

. . . .

Q:    Is there anything that you learned in your prosecution of Mr. Stokes that inhibited you in his defense in any manner?

A:    No.

App. 1869. Sims also spoke with co-counsel Johnson, who never expressed any concern about Sims' prior prosecution of Petitioner. App. 1870.

On cross-examination, Sims recalled researching the admissibility of Petitioner's prior convictions under South Carolina law, filing a motion to exclude the prior convictions, and arguing the motion to the trial court. App. 1876, 1880–90. Sims also recalled informing the trial court that his name appeared on the 1991 indictment. App. 1885; *see* App. 1637 (Sims informing the trial court). Furthermore, Sims reiterated he had conversations with Petitioner in which they discussed his prior prosecution of Petitioner, the fact that Petitioner went to prison because of that prosecution, and the evidence the State would seek to use at trial (including the 1991 ABHAN conviction). App. 1891–92.

On redirect, Sims again testified he anticipated Audrey Smith would testify at trial and explained that fact to Petitioner. App. 1895. Sims recalled his name being on the 1991 indictment and wanting to make sure the jury did not see the actual indictment. App. 1896. He testified he "fought to keep []" out" Smith's testimony but anticipated the trial court would still admit it. App. 1906. He again confirmed Petitioner knew of his prior prosecutorial role:

Q:    What exactly did you tell [Petitioner] his options were as far

as representation, who could represent him?

A:     Let me put it this way, he knew that I had been the prosecutor. He knew that I had been the one to prosecute him, and, of course, my practice would have been to say, look, you have any problems with that? And, of course, after the trial he had no problem with it because he wanted me to go back and represent him again if the matter had been - - if the appeal had been upheld. . . . Mr. Stokes knew quite well if he had a problem with it all he had to do was to voice a problem, because during the course of our conversations I said, no, look, if you've got a problem with this let me know. And during the trial, when that issue came up - - we talked about that indictment, too.

Q:     Okay. And Virgin Johnson was present during your discussions with him about that?

A:     Yes.

App. 1896.

On recross, Sims clarified the trial record indicated that the trial court was aware he had "conducted the ministerial task of signing the [1991] indictment," but not that he "had personally prosecuted that case." App. 1899. Additionally, Sims confirmed he (not Johnson) was the attorney who made all arguments and examined all witnesses at trial. App. 1904. Sims again testified he reminded Petitioner he was the prosecutor from the 1991 trial. App. 1904–05.

### b.     Johnson's Testimony at the PCR Hearing

Johnson testified that he knew Sims had prosecuted Petitioner and that they (Johnson and Sims) discussed the potential conflict of interest issue with Petitioner when they began representing him. App. 1909–10. Johnson remembered Sims "said . . . you know I put you in jail or I prosecuted you[,] and Sammie said yes," and that Petitioner said he had no problem with Sims representing him. App. 1910. Sims and Petitioner had a "good" relationship, and Petitioner expressed a desire to have Sims as his

13

attorney again if his appeal succeeded. App. 1910. Johnson and Sims discussed with Petitioner the possibility of Smith's testimony concerning the 1991 ABHAN conviction being presented during the penalty phase, and Petitioner never sought to have Sims relieved as counsel. App. 1910–11, 1913. Johnson never sensed Sims was hesitating to act on Petitioner's behalf based upon the prior conviction. App. 1911–12.

At the conclusion of the hearing, the PCR court confirmed "[t]here's no waiver on the [trial] record that anybody could find." App. 1916. Petitioner did not offer his live testimony at the PCR hearing and thus did not contradict Sims' or Johnson's testimony about their conversations with him on this issue.[14]

## B. PCR Orders[15]

The PCR court issued an order denying relief on Petitioner's conflict of interest claim. App. 2163–83. Citing cases including *Cuyler v. Sullivan*, 446 U.S. 335 (1980), and *Mickens v. Taylor*, 535 U.S. 162 (2002), the PCR court found (1) that Petitioner did not demonstrate an actual conflict of interest and (2) that he did not show the alleged conflict adversely affected Sims' representation of him.

---

[14]     Sims and Johnson were the State's witnesses at the PCR hearing. App. 1810, 1857, 1908. Petitioner called two witnesses, one of which was attorney Jeffrey Bloom. App. 1848. Bloom testified he met with Sims "shortly sometime after April 1999" to discuss a jury issue as well as "a potential conflict of interest issue" regarding Sims' prior prosecution of Petitioner and the resulting conviction. App. 1850–51. Bloom asserted he told Sims to request an ex parte hearing before the trial court to address the matter, but when Sims later called to discuss the jury issue and "didn't seem concerned about" the conflict issue, Bloom "sever[ed] any professional relationship to the case." App. 1853–54. However, Sims (who was sequestered during Bloom's testimony) testified he did not recall discussing any potential conflict issue with Bloom, App. 1866, and the PCR court found Sims' testimony credible and discounted Bloom's testimony. App. 2173 n.10, 2385–90.
        Moreover, Petitioner was present at the PCR hearing but did not testify. He later submitted an affidavit seeking to contradict the testimony of Sims and Johnson. App. 1929–30. The PCR court rejected the affidavit because it was untimely and "a blatant attempt to avoid the pitfalls of cross-examination and subjecting [him] to the adversarial process." App. 2183, 2379–85.

[15]     The R & R extensively quotes the PCR court's order denying relief and thoroughly summarizes its findings. R & R at pp. 89–96.

App. 2168–77. Alternatively, the PCR court found Petitioner made a knowing waiver of any conflict. App. 2163, 2177–83. In making these findings, the PCR court found Sims' testimony and Johnson's testimony were both credible. App. 2163. The PCR court subsequently issued an order denying Petitioner's motion to alter or amend and reaffirming its prior rulings. App. 2373–95.

### C.    Magistrate Judge's R & R & Petitioner's Objections

The Magistrate Judge recommends denying relief on Ground Three. R & R at pp. 88–120. Initially, the Magistrate Judge rejects Petitioner's argument that a different standard of review should apply because the PCR court adopted the State's proposed order without modification. *Id.* at pp. 96–97. Regarding the merits of Petitioner's claim, the Magistrate Judge concludes the PCR court's finding of no actual conflict of interest was not based on an unreasonable determination of the facts because Petitioner fails to show either an actual conflict or an adverse effect. *Id.* at pp. 97–112. The Magistrate Judge further concludes the PCR court's alternative finding that Petitioner waived any actual conflict was not an unreasonable application of Supreme Court precedent. *Id.* at pp. 113–20. Petitioner objects to these findings. *See* Pet.'s Objs. at pp. 2–10.

### D.    Standard of Review

Ground Three is exhausted and ripe for review on the merits because Petitioner presented it to the state PCR court, the PCR court denied relief on the claim, and the South Carolina Supreme Court denied certiorari to review the PCR court's ruling.[16] *See generally Hedrick v. True*, 443 F.3d 342, 364 (4th Cir. 2006) ("[A] federal habeas court may consider only those issues which have been fairly presented to the state's highest court." (internal quotation marks omitted)). Because the South Carolina

---

[16]      As mentioned above, the U.S. Supreme Court denied certiorari to review the judgment of the South Carolina Supreme Court. The U.S. Supreme Court denied certiorari after conferencing the case multiple times and requesting the state court record. *See* https://www.supremecourt.gov/search.aspx?filename=/docketfiles/15-9329.htm.

Supreme Court summarily denied Petitioner's certiorari petition, *see* ECF No. 18-11, the Court directly reviews the state PCR court's reasoning. *Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015) (applying the "look-through" doctrine); *Hope v. Cartledge*, 857 F.3d 518, 523 (4th Cir. 2017) (same).

Petitioner filed this habeas action after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and therefore 28 U.S.C. § 2254 governs review of his claim in Ground Three. *Lindh v. Murphy*, 521 U.S. 320 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir. 1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication:

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). This is a "difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted). "Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law, while § 2254(d)(2) describes the standard to be applied to claims challenging how the state courts determined the facts." *Winston v. Kelly*, 592 F.3d 535, 553 (4th Cir. 2010). "'[A] determination on a factual issue made by a State court shall be presumed correct,' and the burden is on the petitioner to rebut this presumption 'by clear and convincing evidence.'" *Tucker v. Ozmint*, 350 F.3d 433, 439 (4th Cir. 2003) (quoting 28 U.S.C. § 2254(e)(1)).

Petitioner objects to the Magistrate Judge's conclusion that the PCR court's order warrants

deference under 28 U.S.C. § 2254, claiming the PCR court merely rubber-stamped an order prepared by the State. Pet.'s Objs. at p. 10. Although the practice of signing proposed orders without modification is criticized by both the Fourth Circuit and the South Carolina Supreme Court, *see Bell v. Ozmint*, 332 F.3d 229, 233 (4th Cir. 2003); *Hall v. Catoe*, 601 S.E.2d 335, 341 (S.C. 2004),[17] the PCR court adopted the order as its own and adjudicated Petitioner's conflict claim on the merits. *See Young v. Catoe*, 205 F.3d 750, 755 n.2. (4th Cir. 2000) ("[T]he disposition of a petitioner's constitutional claims in such a manner [adopting a party's proposed order *in toto*] is unquestionably an 'adjudication' by the state court. If that court addresses the merits of the petitioner's claim, then § 2254(d) must be applied."); *Bell*, 332 F.3d at 233 (citing *Young*). Accordingly, the Court still must apply the highly deferential standard of § 2254(d) to Petitioner's conflict claim in Ground Three.

### E.    Analysis

"A criminal defendant's Sixth Amendment right to effective assistance of counsel includes a right to counsel unhindered by conflicts of interest." *Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001), *aff'd*, 535 U.S. 162 (2002). In *Cuyler v. Sullivan*, 446 U.S. 335 (1980), the Supreme Court articulated a two-prong test for analyzing conflict of interest claims.[18] *See Stephens v. Branker*, 570 F.3d 198, 208–09 (4th Cir. 2009) (summarizing the *Cuyler* test). "To establish ineffective assistance of counsel based on a conflict of interest that was not raised before the trial court, the defendant must demonstrate that (1) counsel operated under 'an actual conflict of interest' and (2) this conflict

---

[17]    The PCR court cited *Hall* when rejecting a similar challenge made in Petitioner's motion to alter or amend. App. 2375–79.

[18]    The *Cuyler* test differs from the typical standard governing ineffective assistance claims articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Mickens*, 240 F.3d at 355 ("The *Strickland* Court recognized that a claim of ineffective assistance of counsel arising from counsel's conflict of interest presents a special case subject to the standard articulated by *Cuyler v. Sullivan*, 446 U.S. 335 (1980).").

'adversely affected his lawyer's performance.'" *Woodfolk v. Maynard*, 857 F.3d 531, 553 (4th Cir. 2017) (quoting *Cuyler*, 446 U.S. at 348). "If the defendant satisfies this showing, prejudice is presumed, and the defendant need not demonstrate a reasonable probability that, but for counsel's conflicted representation, the outcome of the proceeding would have been different." *Id.*; *see Mickens*, 240 F.3d at 355 ("After a petitioner satisfies this two-part test, prejudice is presumed.").

"[B]ecause an actual conflict of interest requires not only a theoretically divided loyalty, but also a conflict that actually affected counsel's performance, the actual conflict and adverse effect inquiries frequently are intertwined." *Woodfolk*, 857 F.3d at 553. "[T]he possibility of conflict is insufficient to impugn a criminal conviction," and "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350.

The Court will address each prong of the *Cuyler* test in turn.

### 1. Actual Conflict

*Cuyler*'s first prong requires a habeas petitioner to demonstrate "that his counsel actively represented conflicting interests." 446 U.S. at 350. The petitioner "must show that his interests diverged from his attorney's with respect to a material factual or legal issue or to a course of action." *Stephens*, 570 F.3d at 209 (internal brackets and quotation marks omitted).

The PCR court determined Sims' prior prosecution of Stokes did not create an actual conflict for the following reasons:

- Sims and Johnson both gave credible testimony. App. 2163, 2173, 2389–90.

- A per se conflict does not exist based upon a prior prosecution involving a different crime. App. 2173 (citing *State v. Childers*, 645 S.E.2d 233, 235 (S.C. 2007)).

18

- Sims and Johnson discussed with Petitioner his right to have different counsel appointed due to Sims' earlier prosecution of him; Petitioner was aware of Sims' prior prosecution of him and never requested to have Sims removed; and Petitioner advised them that he desired to have Sims continue to represent him. App. 2168–69, 2393.

- Petitioner knowingly and voluntarily waived a conflict of interest with full knowledge of the conflict and the ability to have a different lawyer; and he still desired to have Sims continue to represent him. App. 2163.

- Petitioner never attempted to have Sims relieved as counsel, and the record was "uncontradicted" that Petitioner knew of the prior prosecution. App. 2175.

- Regarding Audrey Smith's testimony and use of the 1991 ABHAN conviction at trial, the PCR court found: "[W]ith at least a six (6) year lapse between Sims being a prosecutor, any divided loyalties argument must fail. Additionally, there was no connection between the former offense and the instant case. The only matter was the existence of the conviction – a proven fact – as evidence in aggravation and the fact that Audrey Smith testified in the penalty phase about the circumstances of the conviction.[19] There is no showing that the prior prosecution adversely affected his representation of Stokes based upon this state witness (Audrey Smith) – a person whom he never represented. There were no divided loyalties in the matter. The simple fact of the former prosecution did not provide proof of a conflict of interest." App. 2176. The PCR court further credited Sims' testimony "that he was aware of the [S]tate's intent to use the Audrey Smith indictment and conviction in the penalty phase," "that he fought to keep the evidence out," and that he denied ever telling Petitioner that the evidence would not be admitted. App. 2391–93.

- Alternatively, the PCR court determined Petitioner made a knowing waiver of a conflict of interest, finding "Sims's earlier prosecution arose from an independent action and was unrelated to the present prosecution of Stokes. It was already a matter of record concerning the earlier conviction for the Audrey Smith incident. . . . Stokes was aware that Sims had prosecuted him in 1990-1991. He was aware – based upon the credible testimony of Virgin Johnson [–] that he could have somebody else represent him and he

---

[19]    In his objections, Petitioner quotes this sentence and the previous sentence and argues that the PCR court "mischaracterized the scope of the issue" by erroneously treating "the conflict as one involving only the introduction of a conviction as opposed to the presentation of the very same testimony by the very same witness, only with Mr. Sims now participating on the opposite side." Pet.'s Objs. at p. 3. Petitioner further argues the Magistrate Judge erred in "rewriting [] the PCR court's order" and finding its conclusion reasonable. *Id.* However, contrary to Petitioner's argument, the Court notes the PCR court's order clearly grasps the full extent of the issue—as one involving not only Sims' prior prosecution of Petitioner and use of the prior conviction against Petitioner but also the witness's (Audrey Smith's) testimony against Petitioner at his capital trial. This is highlighted by the fact that the PCR court's order summarizes and compares Smith's testimony from the 1991 ABWIK trial and the 1999 capital trial and Sims' testimony regarding same.

stated no. This Court finds that the Applicant waived his right to have counsel other than Thomas Sims represent him." App. 2177, 2183.

In reaching the above findings, the PCR court summarized the facts relating to Sims' 1991 prosecution of Petitioner, Smith's testimony at the 1991 trial and Sims' direct examination of her, Smith's testimony at the 1999 capital trial and Sims' cross-examination of her, and the PCR testimony of Sims and Johnson. App. 2163–67, 2169–73.

The Court finds the PCR court's conclusion that no actual conflict existed was not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Initially, the Court emphasizes it does not take lightly the alleged conflict at issue and the fact that Sims' prior prosecution of Petitioner was never raised in open court and never brought to the trial court's attention during any phase of the proceedings. It goes without saying that the obvious and prudent course would have been for Sims to have immediately brought the potential conflict to the trial court's attention and placed Petitioner's knowing and voluntary waiver on the record. The Court further recognizes the unique distinction in this case is not only that Petitioner was previously prosecuted by one of his attorneys, but also that the prior conviction was used against him as aggravating evidence and that the victim from the prior prosecution (his ex-wife, no less) testified against him in aggravation. However, the Court cannot ignore Sims' and Johnson's PCR testimony and the PCR court's credibility findings regarding it.

As both Sims and Johnson testified, they met with Petitioner before trial and squarely addressed the conflict issue by discussing with him the fact that Sims had previously prosecuted him, that Petitioner was incarcerated due to this prosecution, and that the 1991 ABHAN conviction *and* Audrey Smith's testimony would be presented as aggravating evidence at trial. Notably, Sims told Petitioner

20

in unequivocal terms that "I'm the one who prosecuted you, sent you to jail," after which Petitioner said he still wanted Sims as his attorney. Sims also made it clear to Petitioner that he could have another lawyer besides him. Moreover, Sims and Johnson testified that Petitioner was aware of Sims' prior prosecutorial role and that Petitioner *never* indicated to them that he wanted Sims relieved as counsel.

Significantly, the PCR court heard Sims' and Johnson's testimony and found them both credible, and this Court is mindful that a federal habeas court cannot overturn a state court's credibility findings absent "stark and clear" error. *Cagle v. Branker*, 520 F.3d 320, 324 (4th Cir. 2008) (citing 28 U.S.C. § 2254(e)(1)). "Indeed, 'federal habeas courts [have] no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.'" *Id.* (quoting *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). The Court discerns no stark and clear error in the PCR court's credibility findings that Sims and Johnson both discussed the conflict issue with Petitioner and that Petitioner waived any potential conflict. *See, e.g.*, *Vinson v. True*, 436 F.3d 412, 418 (4th Cir. 2006) (rejecting a conflict claim where the petitioner's second-chair counsel was suing lead counsel, in part because the petitioner "was fully informed by counsel of the details of the conflict and was told he could obtain alternate counsel, but that he decided to continue with . . . his counsel").

Petitioner argues the record "remains silent on whether Mr. Stokes waived his right to conflict-free counsel with a complete understanding of the full implications of the waiver." Pet.'s Objs. at p. 7. He asserts the PCR court's conclusion regarding waiver is unreasonable. *Id.* at pp. 7–10.[20] "To establish in habeas corpus a deprivation of their constitutional right to effective assistance of counsel,

---

[20]    Petitioner further argues the record does not indicate he actually knew before trial that Sims would be cross-examining Smith (rather than just the 1991 ABHAN conviction being admitted). Pet.'s Objs. at p. 7. This assertion is simply incorrect because, as summarized above, both Sims and Johnson testified they discussed with Petitioner the strong possibility that Smith herself would testify at trial about the facts giving rise to the 1991 ABHAN conviction. *See* App. 1867–88, 1891–92, 1895, 1910–11, 1913.

[p]etitioners must show that they did not intentionally, knowingly, and voluntarily relinquish this right." *Gilbert v. Moore*, 134 F.3d 642, 653 (4th Cir. 1998). A "habeas petitioner carries the burden of showing the absence of a valid waiver of conflict-free counsel." *Id.* Importantly, "the question whether the accused waived his rights *is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights*." *Id.* (internal quotation marks omitted and emphasis added). Here, the PCR court determined—after finding Sims' and Johnson's testimony credible—that Petitioner was apprised of the potential conflict by both trial counsel, knew he could have Sims removed as counsel if he wanted, and knowingly and voluntarily waived any potential conflict with full knowledge of it by keeping Sims as his lawyer. Given this credibility-driven determination, the Court cannot conclude the PCR court's (1) finding of no conflict and (2) determination that Petitioner waived any potential conflict after speaking with his lawyers were contrary to or unreasonably applied Supreme Court precedent or were an unreasonable determination of the facts.[21] *See* 28 U.S.C. § 2254(d); *see, e.g.*, *Gilbert*, 134 F.3d at 653 (finding habeas petitioners represented by a single attorney at trial "failed to establish that they did not intentionally, knowingly, and voluntarily waive their right to conflict-free counsel"; and relying in part on trial counsel's PCR testimony that he discussed the conflict issue with his clients before trial); *Hester v. Ballard*, 679 F. App'x 273, 284 (4th Cir. 2017) ("Any 'actual conflict of interest' that may

---

[21]     To the extent Petitioner claims his waiver is invalid because the trial court never inquired into a possible conflict of interest, that argument lacks merit. *See Fullwood v. Lee*, 290 F.3d 663, 690 (4th Cir. 2002) ("Fullwood claims that he is entitled to relief . . . because there was no inquiry by the trial court into a possible conflict of interest. The Supreme Court, however, recently rejected the idea that a habeas petitioner is automatically entitled to relief when the trial court fails to make an inquiry mandated by *Cuyler*. *See Mickens v. Taylor*, 535 U.S. 162, 172–73 (2002).").

        Furthermore, the Court notes the PCR court never actually found an *actual* conflict of interest but still made an alternative finding of waiver. App. 2177–83. The Fourth Circuit has indicated it is appropriate to discuss waiver when addressing the first prong of the *Cuyler* test. *See, e.g.*, *Vinson*, 436 F.3d at 417–18 (discussing conflict and waiver together); *Hester*, 679 F. App'x at 284 (same). *But see Gilbert*, 134 F.3d at 652–53 (treating waiver separately from the conflict analysis). In any event, the Court finds the PCR court's alternative finding that Petitioner made "a knowing waiver of a conflict of interest," App. 2177, was not contrary to or an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

have existed . . . was rendered null by [a] knowing and voluntary waiver of the conflict . . . , and the state habeas court's conclusion was, accordingly, not an unreasonable application of clearly established law.").

To reiterate, "the *possibility* of conflict is insufficient to impugn a criminal conviction," and "a defendant must establish that an *actual* conflict of interest" existed. *Cuyler*, 446 U.S. at 350 (emphases added). Petitioner has not demonstrated an *actual* conflict and therefore has not satisfied the first prong of the *Cuyler* test. *See, e.g.*, *Hester*, 679 F. App'x at 284–85 (finding the state court did not unreasonably apply *Cuyler* in finding no actual conflict where trial counsel had previously represented a prosecution witness); *Chandler v. Lee*, 89 F. App'x 830, 839–41 (4th Cir. 2004) (finding "that while [trial counsel]'s prior representation of [a key prosecution witness] created a *potential* conflict of interest, there was never an *actual* conflict"). However, even assuming *arguendo* the existence of an actual conflict, Petitioner's claim still fails because he cannot show an adverse affect.

### 2. Adverse Effect

*Cuyler*'s second prong (that an actual conflict "adversely affected" the lawyer's performance) requires a habeas petitioner to satisfy three requirements, referred to as the "*Mickens* factors." *See Stephens*, 570 F.3d at 209–12. A petitioner must "(1) identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued, (2) show that this strategy was objectively reasonable under the facts of the case known to the attorney at the time, and (3) show that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." *Woodfolk*, 857 F.3d at 553 (internal quotation marks omitted); *see Mickens*, 240 F.3d at 361 (articulating this three-part test). "The adverse effect inquiry is often fact dependent, mandating due deference to the factfinder," and as mentioned above, "the actual conflict and adverse effect inquiries frequently are intertwined." *Id.*

23

The PCR court made the following findings relevant to the Court's adverse effect inquiry:[22]

- Sims and Johnson both gave credible testimony. App. 2163, 2173, 2389–90.

- Regarding Audrey Smith's testimony and the use of the 1991 ABHAN conviction at trial, the PCR court found: "[W]ith at least a six (6) year lapse between Sims being a prosecutor, any divided loyalties argument must fail. Additionally, there was no connection between the former offense and the instant case. The only matter was the existence of the conviction – a proven fact – as evidence in aggravation and the fact that Audrey Smith testified in the penalty phase about the circumstances of the conviction. There is no showing that the prior prosecution **adversely affected** his representation of Stokes based upon this state witness (Audrey Smith) – a person whom he never represented. There were no divided loyalties in the matter. The simple fact of the former prosecution did not provide proof of a conflict of interest." App. 2176 (emphasis added).

- The PCR court further credited Sims' testimony "that he was aware of the [S]tate's intent to use the Audrey Smith indictment and conviction in the penalty phase," "that he fought to keep the evidence out," and that he denied ever telling Petitioner that the evidence would not be admitted. App. 2391–93.

As explained below, the Court concludes the PCR court's finding of no adverse effect was not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

The first *Mickens* factor requires Petitioner "to identify a plausible alternative defense strategy or tactic that his defense counsel might have pursued." 240 F.3d at 361. Petitioner argues Sims failed to thoroughly cross-examine Smith to elicit discrepancies between her testimony at the 1991 trial and the 1999 capital sentencing proceeding.[23] *See* Pet.'s Objs. at pp. 3–6. Even assuming this strategy was plausible, Petitioner still fails to satisfy both the second and third *Mickens* factors.

---

[22]    Petitioner argues the PCR court made no findings regarding adverse effect "other than an implicit denial." Pet.'s Objs. at p. 5. However, as the bulletpoints below indicate, the PCR court did in fact make such findings and specifically found no adverse effect. *See, infra*, App. 187 ("There is no showing that the prior prosecution adversely affected [Sims'] representation of Stokes based upon this state witness (Audrey Smith) . . . ."). Also, as mentioned above, "the actual conflict and adverse effect inquiries frequently are intertwined." *Woodfolk*, 857 F.3d at 553.

[23]    The R & R identifies these alleged discrepancies. *See* R & R at pp. 108–09.

24

Regarding the second *Mickens* factor, Petitioner's proposed defense strategy of vigorous cross-examination was not objectively reasonable given the facts available to Sims at the time of trial. *See* 240 F.3d at 361. "To demonstrate objective reasonableness, the petitioner must show that the alternative strategy or tactic was clearly suggested by the circumstances." *Stephens*, 570 F.3d at 209 (brackets and internal quotation marks omitted). As indicated above, Sims' brief cross-examination of Smith did not contest the underlying facts of the 1991 ABHAN conviction but instead focused on the letters Petitioner had written her from prison in which he "ask[ed her] about being [her] friend" and "trying to get his head straight." App. 1142–44. The PCR court credited Sims' testimony that he knew Audrey Smith would testify, that Petitioner's letters would be introduced at trial, and that he planned to address these matters by attempting to show remorse. App. 1867–68 (Sims' testimony); App. 2163, 2168, 2170 (PCR court order). Because Sims' trial strategy was to show Petitioner's remorse for what he had done to Smith, it would have been objectively unreasonable for him to have exhaustively cross-examined and attacked her about testimony in which she described for the jury Petitioner's assault upon her. The fact remained that Petitioner had choked Smith with an extension cord until she passed out, and Smith reaffirmed the essential facts underlying that proven, prior conviction. A contrary approach would have undermined Sims' defense theory of remorse. As the Magistrate Judge aptly observed, "[a]n attempt to have more aggressively cross-examined Smith on those points could have hindered Sims's attempts to show Petitioner's remorse or could have spurred even more detailed testimony on the previous incidents." R & R at p. 112. Accordingly, Petitioner fails to satisfy the second *Mickens* factor.

As for the third *Mickens* factor, Petitioner has not established Sims' failure to pursue the alternative strategy—thoroughly cross-examining Smith about discrepancies in her 1991 testimony and

1999 testimony—was linked to the alleged actual conflict. *See* 240 F.3d at 361. Petitioner argues there is a "dramatic difference" in how Petitioner's defense attorney in the 1991 trial cross-examined Smith and in how Sims cross-examined her at the 1999 sentencing phase. Pet.'s Objs. at pp. 4–6. This argument is akin to comparing apples and oranges; a defense attorney contesting his client's guilt in a non-capital trial is in an entirely different position than a capital defender striving to get his client a life sentence and having to dampen the effect of a prior conviction. Furthermore, the PCR court credited Sims' testimony that he "fought" to keep out the 1991 ABHAN conviction and that his prior prosecution of Petitioner for the assault against Smith did not affect how he cross-examined her. App. 1876, 1880–90, 1869, 1906 (Sims' testimony); App. 2163, 2168, 2170–71 (PCR court order). The PCR court also credited Johnson's testimony that he never sensed Sims was hesitating to act on Petitioner's behalf because of the 1991 conviction. App. 1911–12 (Johnson's testimony); App. 2163, 2168, 2173 (PCR court order). Again, Petitioner has not shown "stark and clear" error in these credibility findings, *see Cagle*, 520 F.3d at 324, nor has he rebutted them by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Stephens*, 570 F.3d at 211 (applying § 2254(e)(1) to a *Mickens* factor). In short, there is no evidence in the record to support a finding that Sims' purportedly inadequate cross-examination of Smith resulted from his prior prosecution of Petitioner. Accordingly, Petitioner fails to satisfy the third *Mickens* factor, and thus cannot establish the alleged conflict of interest adversely affected Sims' representation. And again, Petitioner offered no live testimony of his own at the PCR hearing to dispute Sims' or Johnson's testimony.[24]

### 3. Conclusion

---

[24]    *See Milledge v. State*, 811 S.E.2d 796, 800 (S.C. 2018) ("The PCR applicant bears the burden of proving his allegations by a preponderance of the evidence." (citing Rule 71.1(e), SCRCP, and *Frasier v. State*, 570 S.E.2d 172, 174 (S.C. 2002))).

The Court finds the state PCR court's rejection of Petitioner's conflict of interest claim was not contrary to or an unreasonable application of clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, the Court denies relief on Ground Three.

## II. *Martinez Claims*—Grounds Six and Seven

Petitioner brings his procedurally defaulted claims, Ground Six and Seven, pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012), and the Magistrate Judge permitted discovery and held an evidentiary hearing on these claims. The Court notes that as in the state PCR proceedings, Petitioner in the federal *Martinez* hearing did not offer any of his own live testimony to dispute or contradict what his counsel discussed with him regarding any of the issues raised herein.

### A. Applicable Law

#### 1. *Martinez*

"*Martinez* provides a narrow exception to the general rule, stated in *Coleman v. Thompson*, 501 U.S. 722, 752–53 (1991), that errors committed by state habeas counsel do not provide cause to excuse a procedural default." *Gray v. Zook*, 806 F.3d 783, 788 (4th Cir. 2015). The *Martinez* Court held:

> **Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.**

566 U.S. at 17 (emphasis added).[25] The *Martinez* Court explained the approach for reviewing such a

---

[25]     "*Martinez* did not purport to displace *Coleman* as the general rule governing procedural default. Rather, it 'qualifie[d] *Coleman* by recognizing a narrow exception' that applies only to claims of 'ineffective assistance of counsel at trial' and only when, 'under state law,' those claims 'must be raised in an initial-review collateral proceeding.'" *Davila v. Davis*, 137 S. Ct. 2058, 2065–66 (2017) (quoting *Martinez*, 566 U.S. at 9, 17). "This limited qualification of the *Coleman* rule was based on the fact that when an 'initial-review collateral proceeding is the first

27

claim:

> When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial, *i.e.*, it does not have any merit or that it is wholly without factual support, <u>*or*</u> that the attorney in the initial-review collateral proceeding did not perform below constitutional standards.

*Id.* at 15–16 (emphasis added). Thus, "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim" if "appointed counsel in the initial-review collateral proceeding[—]where the claim should have been raised[—]was ineffective under the standards of *Strickland*[.[26]]" *Id.* at 14. The Fourth Circuit has expounded on the requirement of a "substantial" claim:

> Regarding the requirement that there be a "substantial" claim, the Supreme Court held that a prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318. Relatedly, to show ineffective assistance, the petitioner must make a "substantial" showing with respect to both counsel's competency (first-prong *Strickland*) and prejudice (second-prong *Strickland*).
>
> As to the specific elements of the ineffective assistance claim, a petitioner must make a substantial showing of incompetency, i.e., that counsel made errors so serious that counsel was not functioning

---

designated proceeding for a prisoner to raise a claim of ineffective assistance at trial, the collateral proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim.'" *Fowler v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014) (quoting *Martinez*, 566 U.S. at 11). "[F]or states like [South Carolina]—where a petitioner can only raise an ineffective assistance claim on collateral review—*Martinez* announced that federal habeas counsel can investigate and pursue the ineffectiveness of state habeas counsel in an effort to overcome the default of procedurally barred ineffective-assistance-of-trial-counsel claims." *Juniper v. Davis*, 737 F.3d 288, 289 (4th Cir. 2013); *see State v. Felder*, 351 S.E.2d 852, 852 (S.C. 1986) ("This Court usually will not consider an ineffective assistance of counsel issue on appeal from a conviction.").

[26]    *Strickland v. Washington*, 466 U.S. 668 (1984).

as the counsel guaranteed by the Sixth Amendment. Further, the petitioner must make a substantial showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable, i.e., that there was a substantial, not just conceivable, likelihood of a different result.

*Teleguz v. Zook*, 806 F.3d 803, 815 (4th Cir. 2015) (ellipsis, some internal quotation marks, and some internal citations omitted).

To summarize, then, *Martinez* held that a federal habeas petitioner who seeks to raise an otherwise procedurally defaulted claim of ineffective-assistance-of-trial-counsel before the federal court may do so only if: (1) the ineffective-assistance-of-trial-counsel claim is a substantial one; (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding"; (3) "the state collateral review proceeding was the initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim"; and (4) state law "requires that an ineffective-assistance-of-trial-counsel claim be raised in an initial-review collateral proceeding."

*Fowler*, 753 F.3d at 461 (internal quotation marks and alteration in original) (quoting *Trevino v. Thaler*, 569 U.S. 413, 423 (2013)).

In short, "[t]o invoke *Martinez*, [a petitioner] must demonstrate that state habeas counsel was ineffective or absent, and that the underlying [ineffective-assistance-of-trial counsel] claim is substantial." *Porter v. Zook*, 898 F.3d 408, 438 (4th Cir. 2018). Significantly, "because a petitioner raising a *Martinez* claim never presented the claim in state court, a federal court considers it de novo, rather than under AEDPA's deferential standard of review." *Gray*, 806 F.3d at 789.[27]

### 2. *Strickland* Test

Claims of ineffective assistance of counsel must be reviewed under the two-part test enunciated

---

[27]     *Martinez* is inapplicable in South Carolina PCR actions. *See Robertson v. State*, 795 S.E.2d 29, 34, 37 (S.C. 2016); *Kelly v. State*, 745 S.E.2d 377, 377 (S.C. 2013).

in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a petitioner must show counsel's performance was deficient and fell below an objective standard of reasonableness. *Id.* at 687–88. Second, the petitioner must show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Regarding the deficiency prong, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Id.* at 689. "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

Regarding the prejudice prong, "[w]hen a defendant challenges *a death sentence* such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[28] *Id.* at 695 (emphasis added). "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Id.* "In jurisdictions such as South Carolina, where a jury must return a unanimous verdict . . . , the prejudice prong of *Strickland* is met where 'there is a reasonable probability that at least one juror would have

---

[28] In contrast, "[w]hen a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

struck a different balance.'" *Hope*, 857 F.3d at 524 (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

Applying this framework, the Court will now consider Petitioner's *Martinez* claims raised in Grounds Six and Seven.

## B.     Ground Six (Mitigating Evidence Claim)

Petitioner alleges in Ground Six that "[t]rial and collateral counsel were ineffective to the prejudice of [Petitioner] by failing to investigate, develop[,] and present any mitigation evidence." ECF No. 75 at p. 5.  Specifically, Petitioner claims trial counsel were ineffective for failing to investigate and present mitigating evidence regarding his history and background. *See* Pet.'s Objs. at pp. 10–32; ECF No. 75 at pp. 5–32; ECF No. 96 at pp. 1–9; ECF No. 172 at pp. 45–84.  Petitioner faults PCR counsel for failing to pursue this ineffective-assistance-of-trial-counsel claim in the state PCR proceedings, and thus seeks to bring the claim in this Court pursuant to *Martinez*.

### 1.     Facts[29]

Trial counsel called one witness to testify in mitigation during the penalty phase: James Aiken, a prison adaptability expert who opined Petitioner could serve a life sentence without causing undue risk of harm to other inmates or staff.[30] App. 1387–1429.  Although trial counsel had hired a mitigation investigator and assembled additional witnesses to testify in mitigation, they ultimately did not call any other witnesses besides Aiken or present any other mitigating evidence.

In 2001, Petitioner filed his initial PCR application asserting a single ground for relief: that trial

---

[29]     The R & R thoroughly summarizes the facts relevant to Petitioner's claim in Ground Six, and the Court briefly recaps them here.

[30]     Petitioner contests trial counsel's presentation of Aiken's testimony in Ground Seven, which is addressed below.

counsel were ineffective for "[f]ail[ing] to present mitigating evidence."  App. 1714–19.

In 2002, Keir Weyble and Robert Lominack were appointed as PCR counsel, *see* Tr.[31] 57, 368, and they filed an amended PCR application raising three claims, including that trial counsel were ineffective for "fail[ing] to investigate and present available mitigating evidence during the sentencing phase."  App. 1720–22; Pet. Ex. 40.  PCR counsel investigated the mitigation claim by, *inter alia*: reviewing the trial transcript and trial counsel's file, *see* Tr. 31, 371–72; obtaining funding for experts and service providers including a private investigator, a penalty phase investigator, a neuropsychologist, and a forensic pathologist/forensic entomologist, *see* Resp. Exs. 11 & 12; retaining and meeting with their mitigation investigator Tracy Dean, who interviewed Petitioner, family members, and acquaintances and prepared summaries of those interviews, *see* Tr. 39, 54, 380–81; Pet. Ex. 43; Resp. Exs. 13–20, 22; speaking with the neuropsychologist (Dr. Robert Deysach) and the psychiatrist (Dr. Donna Schwartz-Watts) that trial counsel had retained before trial, *see* Tr. 34–36, 489–90; and deposing Sims, who testified at his 2003 deposition that he had originally planned to present evidence showing Petitioner had AIDS and "at some point because of this condition, he's going to be a vegetable," that the AIDS evidence would dovetail with Aiken's prison adaptability testimony (i.e., Petitioner's past history of violence in prison would be a non-issue because of his deteriorating physical condition), that he explained this strategy to Petitioner, and that at the last minute Petitioner "absolutely refused" to allow trial counsel to introduce the AIDS evidence because Petitioner did not want his family or the jury to hear it.  App. 1755–56, 1774–78; *see, e.g.*, App. 1775 (Sims: "Just as we got ready to start presenting that evidence, Sammie then said, no, I don't want it coming in.  I don't want it coming out.").

In 2004, PCR counsel filed a second amended PCR application raising seven grounds for relief

---

[31]     "Tr." refers to the transcript of the evidentiary hearing before the Magistrate Judge.  *See* ECF Nos. 204–07.

but specifically removing and omitting the mitigation claim. App. 1782–86; Pet. Ex. 44. Notably, after filing the second amended PCR application, PCR counsel sent letters to trial counsel informing them that the "application does not contain any allegations of ineffective assistance of trial counsel." Pet. Ex. 45. The mitigation claim was not further pursued in the state PCR proceedings.[32]

At the federal *Martinez* evidentiary hearing, Petitioner called his trial counsel and PCR counsel to testify concerning the mitigating evidence claim in Ground Six. *See* Tr. 27–235 (Lominack), 366–537 (Weyble), 578–630 (Sims), 631–54 (Johnson), 656–70 (Hackett). Petitioner also presented testimony from the neuropsychologist (Dr. Deysach) and the social worker (Dr. Augustus Rodgers) that trial counsel had retained before Petitioner's trial. *See* Tr. 538–50 (Rodgers), 550–66 (Deysach). Finally, Petitioner presented testimony from Dr. James Garbarino, an expert in childhood trauma and developmental psychology retained for purposes of this § 2254 action. *See* Tr. 237–353. Besides the testimony, the Magistrate Judge received into evidence exhibits from Petitioner and Respondent. *See generally* ECF No. 200 (exhibit list). The Court has thoroughly reviewed all this evidence in reaching its decision.

### 2.      Magistrate Judge's R & R & Petitioner's Objections

The Magistrate Judge recommends denying relief on Ground Six. R & R at pp. 136–81. Initially, the Magistrate Judge concludes Petitioner fails to establish that PCR counsel's performance (i.e., abandoning the mitigation claim) was deficient, and this alone prevents him from overcoming the procedural default of Ground Six pursuant to *Martinez*. *Id.* at pp. 138–58. Nevertheless, the Magistrate Judge further concludes Petitioner's underlying ineffective-assistance-of-trial-counsel claim lacks merit

---

[32]      Lominack temporarily left the practice of law after filing the second amended PCR application, but he later returned and was reappointed to represent Petitioner. Susan Barber Hackett was appointed to replace Lominack during his absence.

because trial counsel were not deficient and because Petitioner has not shown resulting prejudice. *Id.* at pp. 158–81. Petitioner objects to these conclusions. *See* Pet.'s Objs. at pp. 10–32.

### 3. Analysis

Having carefully studied the arguments and evidence pertaining to Ground Six, the Court concludes Petitioner is not entitled to habeas relief for two reasons: (1) he has not shown PCR counsel's decision to abandon the mitigation claim was unreasonable; and more significantly, (2) he cannot show *Strickland* prejudice resulting from trial or PCR counsel's performance.

### a. PCR Counsel's Performance

As indicated above, a court considering a *Martinez* claim need not always evaluate trial counsel's performance and may alternatively deny relief if it finds "that the attorney in the initial-review collateral proceeding did not perform below constitutional standards," *Martinez*, 566 U.S. at 16, meaning "the standards of *Strickland v. Washington*." *Id.* at 14. Here, the Court finds PCR counsel's decision to abandon the mitigation claim in favor of other claims was objectively reasonable, and therefore Petitioner fails to show PCR counsel were deficient.

PCR counsel specifically raised a mitigation claim and two other claims when they filed the amended PCR application. However, after investigating the mitigation claim to some extent, they specifically omitted it from the second amended PCR application and presented seven other claims instead. Their contemporaneous 2004 letters to Sims and Johnson—specifying Petitioner was not pursuing any ineffective assistance claims in PCR—underscores their intentional withdrawal of the claim. Although PCR counsel obviously could have pursued the mitigation claim and raised as many claims in PCR as they wanted, they, as capital habeas counsel, chose to pursue the claims they thought would enable Petitioner to obtain relief, such as the conflict claim discussed in Ground Three.

"As commonly happens in post-conviction proceedings," PCR counsel initially attempted to "f[a]ll on [their] sword for [their] former client" during direct examination at the *Martinez* evidentiary hearing. *Dugas v. Coplan*, 428 F.3d 317, 346 n.39 (1st Cir. 2005) (Howard, J., dissenting); *see* R & R at pp. 152–53 (summarizing specific instances of Lominack's and Weyble's testimony). However, under cross-examination by the State, Weyble testified as follows:

> Q:  Well, a claim of failure to present mitigation evidence against trial counsel and an *Atkins*[33] claim, they're not mutually exclusive.
>
> A:  No.
>
> Q:  You could have raised both of those claims.
>
> A:  That's correct.
>
> Q:  And you admit the *Atkins* claim is cleaner.
>
> A:  Cleaner could mean one thing to you and one thing to me.  It is more discrete.  It is.
>
> Q:  Okay.  And the conflict claim is more discrete.
>
> A:  Yes.
>
> Q:  And there had to be a reason that you withdrew it, correct?
>
> A:  True.
>
> **Q:  If you thought it was a strong claim, the IAC [ineffective assistance of counsel] claim, at the time, if you had thought it was a strong claim, would you have presented it?**
>
> **A:  Yes.**
>
> **Q:  If you thought you could obtain relief for Mr. Stokes from**

---

[33]    *Atkins v. Virginia*, 536 U.S. 304 (2002).

**a death sentence on this claim, you wouldn't have
dropped it, would you?**

**A:      I can't imagine we would have.**

Tr. 502–03 (emphasis added). The Magistrate Judge found this portion of Weyble's testimony credible,
and having reviewed the transcript de novo, the Court agrees. *See generally United States v. Boatrite*,
165 F. Supp. 3d 484, 489 (N.D.W. Va. 2016) ("Where a party objects to a magistrate judge's credibility
determinations, the district court must conduct a *de novo* determination on credibility, but the court need
not rehear the contested testimony in order to carry out the statutory command to make the required
determination under § 636. *United States v. Raddatz*, 447 U.S. 667, 674 (1980). . . . A magistrate
judge's credibility determinations based on live testimony are entitled to deference where they are
supported by the record as a whole." (internal quotation marks omitted) (collecting cases)); *cf.
Alexander v. Peguese*, 836 F.2d 545, 1987 WL 30215, at *1 (4th Cir. 1987) (unpublished table decision)
(indicating a district court "must review a magistrate's credibility determinations" by "considering the
actual testimony" and may do so by "listening to a tape or reading a transcript of the hearing" (citing
*Wimmer v. Cook*, 774 F.2d 68, 76 (4th Cir. 1985))).

        "When counsel focuses on some issues to the exclusion of others, there is a strong presumption
that he did so for tactical reasons rather than through sheer neglect. *See Strickland*, 466 U.S. at 690
(counsel is 'strongly presumed' to make decisions in the exercise of professional judgment)."
*Yarborough v. Gentry*, 540 U.S. 1, 8 (2003). "Moreover, even if an omission is inadvertent, relief is
not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged
with the benefit of hindsight." *Id.* at 6. Here, PCR counsel focused on the issues they thought would
afford Petitioner relief from his death sentence, and they reasonably abandoned the mitigation claim as

Weyble credibly testified. Thus, PCR counsel were not deficient in their representation of Petitioner.

### b.    *Strickland* **Prejudice**

Although Petitioner devotes the majority of his objections to Ground Six, he focuses primarily on the *performance* of trial counsel and PCR counsel and only briefly addresses the *prejudice* prong of *Strickland*. *See* Pet.'s Objs. at pp. 10–32. The Court notes:

> [T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. ***If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.***

466 U.S. at 697 (emphasis added); *see, e.g.*, *Wong v. Belmontes*, 558 U.S. 15, 19–28 (2009) (declining to resolve whether trial counsel was deficient because the petitioner could not show prejudice); *Buckner v. Polk*, 453 F.3d 195, 202 (4th Cir. 2006) (same). Here, the Court need not resolve whether trial counsel's performance was deficient because Petitioner cannot establish prejudice.[34]

To show prejudice, Petitioner must demonstrate a reasonable probability that at least one juror would have voted against the death penalty had the jury heard the additional available mitigating evidence concerning his history and background. *See Strickland*, 466 U.S. at 695; *Wiggins*, 539 U.S. at 537; *Wong*, 558 U.S. at 19–20. "To assess that probability," the Court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S.

---

[34]    Given this disposition of Ground Six, the Court need not resolve Petitioner's objections concerning trial counsel's performance or the Magistrate Judge's credibility findings regarding their testimony.

30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000)). A *Strickland* prejudice

analysis requires the Court to "consider the totality of the evidence before the . . . jury." 466 U.S. at

695.

### i.    Available Mitigating Evidence

Again, Petitioner's only mitigating evidence during sentencing was Aiken's prison adaptability

testimony (fully summarized in Ground Seven below) that Petitioner could serve a life sentence without

posing undue risk of harm to other inmates or staff. Petitioner claims the jury should have heard

mitigating evidence concerning his history and background, asserting the files of both trial and PCR

counsel "contain copious evidence, in the form of interviews and records, revealing that Mr. Stokes

suffered from an extremely chaotic background marked by parental instability, poverty, addiction,

violence, and profound trauma." ECF No. 75 at p. 81. Such evidence includes, *inter alia*, that both of

Petitioner's parents died by the time he was thirteen; that his mother and stepfather were notorious,

abusive, and neglectful alcoholics; and that he struggled in school with no intervention. *See* Pet.'s Objs.

at pp. 10–11.

Petitioner further claims the jury should have heard about the cumulative impact that these and

other aspects of his background are known to have on behavioral outcomes, and to support this claim,

he presented the testimony and report of Dr. James Garbarino, an expert in childhood trauma.[35] The

R & R thoroughly summarizes Dr. Garbarino's testimony, *see* R & R at pp. 32–44; in brief, Dr.

Garbarino interviewed Petitioner, reviewed various materials relating to his background, and testified

that Petitioner "was very damaged by the nature of his upbringing" and that "the kind of damage that

---

[35]    Petitioner objects to the Magistrate Judge's treatment of Dr. Garbarino's testimony, *see* Pet.'s Objs. at pp. 28–30. For purposes of its prejudice analysis, the Court will assume Dr. Garbarino's testimony qualifies as available mitigating evidence.

he experienced is very consistent with the terrible nature of the crime that he committed." Tr. 248. Dr. Garbarino also prepared a report with the following summary:

> Sammie Stokes is a damaged human being. He did not choose this damage. Rather, it resulted from the adverse, traumatic, and psychologically toxic nature of his family and social environment during childhood and adolescence. Central to this dynamic being abandoned by his mother when he was a young child. This maternal rejection proved to be a developmentally catastrophic psychological trauma that has dominated his life and his relationships ever since. As a result, the best way to understand him is as "an untreated traumatized child inhabiting an adult's body." This accounts for his serious problems with pro-social decision making ("executive functioning") and appropriately managing his feelings ("affective regulation"). His chronic mental health issues, substance abuse, and issues of acting out violently and antisocially can be traced to his adaptation to extreme adversity, and being the victim of physical and psychological maltreatment (abuse and neglect) during childhood. He has experienced pervasive problems with interpersonal relations that have limited his ability to take advantage of whatever positive opportunities have been made available to him and contributed to the crime for which he is being sentenced. Nonetheless, he has demonstrated a capacity to live safely within a controlled prison environment—as he did for a period of five years prior to his release in 1998.

Pet. Ex. 49 at p. 3.

### ii.     Aggravating Evidence

The State presented extensive aggravating evidence during sentencing. *See generally* App. 1113–1379. First, there was the murder for which Petitioner was on trial. One evening while Petitioner was in state prison "chilling out watching T.V.," his cellmate James Roy Toothe came into the room upset and cursing about how Connie Snipes had caused Toothe's daughter to be taken away by social services. Toothe said that he and his mother Pattie Syphrette wanted Snipes dead so Syphrette could obtain custody of his daughter, and that Petitioner would "be paid well" if he did the job. Over the

following weeks, Petitioner spoke to and corresponded with Syphrette, who agreed to pay Petitioner $2,000 and provide a gun to kill Snipes. Petitioner was released from prison in May 1998, and after he told Norris Martin about the deal with Syphrette, Martin indicated his desire to participate.

On May 22, 1998, Syphrette drove Petitioner, Martin, and Snipes down a dirt road in Branchville, South Carolina, and then Petitioner and Martin walked with Snipes into the woods on the premise that they were going to kill somebody else—Doug Ferguson. Once in the woods, Petitioner informed Snipes that it was she who Syphrette wanted dead. Thereafter,

> Stokes forced Snipes to have sex with Martin at gunpoint. After Martin was finished, Stokes had sex with Snipes. While doing so, Stokes grabbed her breast and stabbed her in the chest, cutting both her nipples. Stokes then rolled her over and began having anal sex with her. When Stokes was finished, he and Martin each shot the victim one time in the head, and then dragged her body into the woods. Stokes then took Martin's knife and scalped her, throwing her hair into the woods. According to Martin, Stokes then cut Snipes' vagina out.

*Stokes*, 548 S.E.2d at 203 (footnotes omitted). Martin testified Snipes was screaming, crying, and moaning when Petitioner cut her breasts, and the State's forensic pathologist testified Snipes' injuries were consistent with having been scalped, having had the nipple area cut from each breast, and having had the entire vaginal area cut out. The pathologist further testified that "[i]t definitely would have been painful" if Snipes were alive when her nipples were cut off, and that she also had incise wounds on her hands that would have been "very painful" and a stab wound on her neck that also would likely have been painful. The jury saw autopsy photographs of Snipes' mutilated and decomposed body.[36]

---

[36]      The jury found four statutory aggravating circumstances: (1) Snipes' murder was committed while in the commission of criminal sexual conduct; (2) Snipes' murder was committed while in the commission of kidnapping; (3) Petitioner murdered Snipes for himself or another for the purpose of receiving money or a thing of monetary value; and (4) Petitioner caused or directed another to murder Snipes as an agent or employee of another person. *See generally* S.C. Code § 16–3–20. Based on these aggravating circumstances, the jury recommended the death penalty.

Petitioner and Syphrette eventually killed Ferguson a few days later, and the jury heard about the horrific circumstances of his murder. When Petitioner was still in prison, he sent Syphrette two gold rings and a watch to hold for him until his release, but Ferguson apparently stole these items. Ferguson had lived with Syphrette, Snipes, and Snipes' newborn son Brian during the spring of 1998. After Snipes' body was found and reported on the news, Syphrette told Petitioner that she was worried Ferguson would talk to police and that they needed "to do something with Doug." On May 28 (six days after Snipes' murder), Syphrette picked up Ferguson from another location and drove him to her home where Petitioner was waiting. Brian Snipes and Faith Lapp (Syphrette's friend and neighbor) were also there. Ferguson hugged and kissed baby Brian and then sat down on the couch, whereupon Petitioner entered the room wearing latex gloves telling Ferguson he was going to teach him a lesson for having stolen his rings and watch. Syphrette said they should tie up Ferguson with duct tape. According to Lapp, Ferguson started crying while being taped up and begged Petitioner and Syphrette not to shoot him. Ultimately, Petitioner and Syphrette wrapped duct tape around Ferguson's entire body and head, thereby suffocating him. Petitioner also punched Ferguson in the face and drew blood. Later that day, police arrived at Syphrette's residence to serve a warrant and found Petitioner hiding under a bed and Ferguson's duct-taped body. To perform the autopsy, the State's pathologist had to cut layers of tape from Ferguson's body. The pathologist testified that Ferguson's face was wrapped with multiple layers of duct tape and that he was conscious during the taping and died from suffocation due to the tape covering his nose and mouth. The pathologist further testified a suffocating person unable to breath experiences a great deal of pain before passing out. The jury saw autopsy photographs of Ferguson's body both before and after the duct tape was removed.

Petitioner confessed to both murders in a lengthy letter that was read to the jury during

sentencing.  He concluded the letter—which was replete with profanity and described the murders in a largely apathetic fashion—by stating, "there's no excuse because we all have choices in life."

The State also presented evidence of Petitioner's future dangerousness, including his criminal history consisting of three prior ABHAN offenses, two committed against his former wife Audrey Smith and the other committed against an inmate.[37]  Smith testified as the State's first witness during sentencing, and she described Petitioner's assaults on her in November 1987 and December 1990. During the 1987 assault, Petitioner came to Smith's apartment asking for a glass of water, told her to turn around, and put a knife to her throat.  After a struggle during which Petitioner cut both of Smith's hands, he held her hostage in a hot attic at knifepoint while her family looked for her, threatening to kill her children if she made a sound.  When it was dark, Petitioner took Smith outside and put her in a ditch; when Smith yelled for her brother, Petitioner stabbed her three times in the back and took off running.  Petitioner was convicted and sentenced for this assault.

During the 1990 assault, Petitioner came to Smith's house, told her he had something to tell her, and took her on a walk in the afternoon.  Petitioner gave her a letter that stated he was going to kill her that night.  Petitioner took the letter back and led her into the woods, where he pulled out a knotted extension cord that he put around her neck.  Smith passed out and woke up later that night, and she was in the hospital for several weeks.  Petitioner was convicted and sentenced for this assault.

During Smith's testimony, the State published numerous letters that Petitioner wrote her from prison.  In these letters, Petitioner indicated he was struggling with thoughts of killing her and reminded

---

[37]     "[I]nformation concerning prior criminal convictions [is] admissible as additional evidence during the sentencing or resentencing phase of a capital trial under [the South Carolina death penalty] statute."  *State v. Plath*, 313 S.E.2d 619, 623 (S.C. 1984).  "[T]he State's evidence in aggravation is not limited to evidence relating to statutory aggravating circumstances."  *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994).  "The defendant's character, prior criminal history, mental capacity, background, and age are just a few of the many factors, in addition to future dangerousness, that a jury may consider in fixing appropriate punishment."  *Id.* at 163.

her that he would eventually get out of prison and search for her.

Regarding Petitioner's third ABHAN offense, the State presented evidence showing he was in a prison restroom when he attacked another inmate—Jackie Williams—by slashing Williams' face with a box cutter. The jury also saw photographs of Williams' injured face. Petitioner was convicted and sentenced for this assault.

Finally, the State presented evidence that Petitioner assaulted another inmate while he was in jail awaiting trial. During this assault, Petitioner hit the inmate multiple times with his fist, and the inmate did not strike Petitioner. Jail officials placed Petitioner on lockdown as a result of the incident.

### iii.    Aggravating Evidence vs. Mitigating Evidence

Having reweighed "the entire body of mitigating evidence" (i.e., Aiken's prison adaptability testimony and the additional evidence about Petitioner's traumatic background) "against the entire body of aggravating evidence," *Wong*, 558 U.S. at 20, the Court concludes Petitioner fails to show *Strickland* prejudice. The aggravating evidence in this case was overwhelming. "It is hard to imagine expert testimony and additional facts about [Petitioner's] difficult childhood outweighing the facts of [Snipes'] murder. It becomes even harder to envision such a result when the evidence that [Petitioner] had committed another murder [of Ferguson]—the most powerful imaginable aggravating evidence—is added to the mix." *Id.* at 27–28 (internal citation omitted). And the additional evidence of Petitioner's ABHAN offenses further tips the scale against him. *See, e.g., Morva v. Zook*, 821 F.3d 517, 532 (4th Cir. 2016) ("Even the most sympathetic evidence in the record about Morva's troubled childhood and mental health does not outweigh the aggravating evidence presented at trial." (internal footnote omitted)).

Simply put, all the mitigating evidence does not outweigh all the aggravating evidence presented

at trial, and Petitioner has not shown a reasonable probability that at least one juror would have voted against the death penalty had it heard the additional mitigating evidence in question. Because Petitioner fails to show *Strickland* prejudice, his underlying claim of ineffective assistance of trial counsel is not substantial and thus is procedurally defaulted. *See Martinez*, 566 U.S. at 14. The Court denies relief on Ground Six.

### C. Ground Seven (Prison Adaptability Expert)

Petitioner alleges in Ground Seven that his "Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel offered an expert witness not suitable for the case and failed to prepare[] that witness." ECF No. 75 at p. 32. Specifically, Petitioner argues trial counsel's decision to present prison adaptability expert James Aiken had negative consequences because: Aiken had never met or spoken to Petitioner; Aiken failed to point out Petitioner had not committed an infraction during the last four-and-a-half years prior to his release; and the State was able to introduce additional aggravating evidence and undermine Aiken's testimony by using it against Petitioner. *See* Pet.'s Objs. at pp. 32–39; ECF No. 75 at pp. 32–36; ECF No. 96 at pp. 10–15; ECF No. 172 at pp. 84–94. Petitioner faults PCR counsel for failing to raise this ineffective-assistance-of-trial-counsel claim in the state PCR proceedings, and therefore seeks to bring the claim in this Court pursuant to *Martinez*.

#### 1. Facts

As previously mentioned, trial counsel called Aiken as Petitioner's sole witness during the sentencing phase. App. 1387–1429. Aiken, a former prison warden, testified as an expert in the area of prison adaptability, and on direct examination by Sims, he opined that "[t]his individual can be incarcerated in the South Carolina Department of Corrections for the remainder of his life without

causing undue risk o[f] harm to other inmates, staff[,] or the general community," and that "I do not see anything in this profile that would indicate that the South Carolina Department of Corrections was not capable of adequately managing this individual." App. 1397–98. Aiken explained he reached these conclusions after reviewing "all of" Petitioner's prison records and the disciplinary violations that Petitioner had committed while incarcerated, including the assault against another inmate resulting in an ABHAN conviction. App. 1393–1401. Aiken noted Petitioner's record reflected incidents of fighting in prison, but explained that "prison is a violent place" and that the Department of Corrections "took very deliberate actions" to deal with the assault. App. 1399–1400.

On cross-examination by the State, Aiken acknowledged he had never spoken to Petitioner but asserted he chose not to because he formed his opinion the way a prison warden would—by reviewing Petitioner's official record and making decisions based on that record. App. 1405. Aiken reiterated "this particular record . . . indicates to me very clearly that he can [be] housed in the correctional environment for the remainder of his life without causing undue risk of harm to staff, inmates as well as the general public." App. 1405–06. Aiken further testified "this individual, Mr. Stokes, should be housed in a maximum security facility for the remainder of his life" and that maximum security houses "[t]he most volatile, dangerous inmates." App. 1410. The State also asked Aiken about Petitioner's three prior ABHAN convictions, namely the 1988 and 1991 ABHAN convictions involving Petitioner's former wife Smith and the 1993 ABHAN conviction involving inmate Jackie Williams. App. 1406–19. When questioned about the specifics of the 1993 ABHAN conviction and how it affected his opinion, Aiken explained that prison adaptability encompasses "managing" prisoners who commit infractions and that Petitioner would be housed in a maximum security environment. App. 1411–12. Aiken clarified, "I'm not saying that he will not have any problems adapting. . . . What I'm saying is that if

45

that [violent] behavior is demonstrated, the Department of Corrections can adequately deal with that situation." App. 1414.[38] Aiken further testified that the Department of Corrections could "effect lethal force" if necessary and that he himself had ordered inmates killed because they did not follow rules. App. 1408, 1414. When asked how he would classify Petitioner based on his convictions for murder, rape, and kidnapping, Aiken stated Petitioner would "remain in maximum custody" and "will never be able to go down to medium or minimum security as long as he lives. There is no behavior that he can demonstrate that will bring him out of maximum security." App. 1425. Finally, Aiken reiterated Petitioner would be placed in a prison where the probability of him assaulting another inmate was "minuscule." App. 1426–27.

During the *Martinez* evidentiary hearing before the Magistrate Judge, both Sims and Johnson recalled offering Aiken to testify about prison adaptability. Tr. 591, 646, 653. When shown a copy of Petitioner's prison records, Sims acknowledged that "something important for James Aiken to know about" would have been the fact that Petitioner had not had an infraction for several years prior to his 1998 release. Tr. 592. However, Sims testified his impression of Aiken's testimony was "[t]hat [it] was a very strong statement," particularly Aiken's testimony that corrections officials would kill Petitioner if necessary to control him. Tr. 605. Johnson likewise recalled this specific portion of Aiken's testimony. Tr. 653 ("[T]hat made my heart grieve for Sammie more because Mr. Aiken said, yes, we can control him, because if he acts up, we'll kill him."). Lominack and Weyble also testified about their decision not to raise a claim concerning Aiken, *see* Tr. 53–54, 393–94, and the Magistrate

---

[38] The State also drew Aiken's attention to other disciplinary violations including an incident where Petitioner and another inmate assaulted an older inmate and an incident in jail where Petitioner struck another inmate. App. 1415–16, 1420–22. Aiken acknowledged these incidents appeared in Petitioner's record, and indicated he formed his opinion after reviewing all documentation. App. 1415–16, 1420–22.

Judge found their testimony credible.  R & R at pp. 182–84.

### 2.    Magistrate Judge's R & R & Petitioner's Objections

The Magistrate Judge recommends denying relief on Ground Seven.  R & R at pp. 181–92. Initially, the Magistrate Judge concludes Petitioner fails to establish that PCR counsel's performance (i.e., failing to raise in PCR an ineffective assistance claim regarding Aiken's testimony) was deficient, and this alone prevents him from overcoming the procedural default of Ground Seven pursuant to *Martinez*.  *Id.* at pp. 182–84.  Nevertheless, the Magistrate Judge further concludes Petitioner's underlying ineffective-assistance-of-trial-counsel claim lacks merit because trial counsel were not deficient and because Petitioner has not shown resulting prejudice.  *Id.* at pp. 184–92.  Petitioner objects to these conclusions.  *See* Pet.'s Objs. at pp. 32–39.

### 3.    Analysis

Petitioner alleges "trial counsel's decision to put [Aiken] on, in this situation, was ineffective." Pet.'s Objs. at 34.  As previously explained, this claim is procedurally defaulted and Petitioner must show cause to excuse the default by demonstrating that the underlying claim of ineffective-assistance-of-trial counsel is "substantial."  *Martinez*, 566 U.S. at 1318.  Petitioner cannot make that showing because, as explained below, he fails to demonstrate trial counsel were ineffective under *Strickland*.

### a.    Deficient Performance

Petitioner fails to show trial counsel were deficient for calling Aiken as a witness.  Again, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms," *Strickland*, 466 U.S. at 688, and "[j]udicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Specifically, "[t]he choice of what type of expert to use is one of trial strategy and deserves a heavy measure of deference." *Fulks v. United States*, 875 F. Supp. 2d 535, 598 (D.S.C.

2010) (internal quotation marks omitted).  Regarding Petitioner's claim that Aiken was an unsuitable witness because he had never met or spoken to Petitioner, Aiken's very testimony belies this assertion. Aiken (a former warden himself) testified he formed his opinion the way a prison official would—not by interviewing the prisoner himself but by reviewing the prisoner's official record and the infractions/violations recorded therein.  In fact, Aiken flatly stated he chose not to interview Petitioner and still "d[id]n't care to" because Petitioner's prison record "very clearly" gave him all the information needed to form his opinion.  App. 1405–06.

Moreover, to the extent Petitioner challenges trial counsel's alleged failure to have Aiken testify that Petitioner had not committed a disciplinary infraction during the last several years before his release in 1998 (the last infraction being in July 1993), this claim lacks merit for several reasons.  First, this challenge is a classic example of wanting to review counsel's performance with "the distorting effects of hindsight."  *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). Second, Aiken's expert method entailed review of what Petitioner's prison record contained, not what it did not.  Third, Aiken actually confirmed that "the last thing [he] kn[e]w about any problems in the Department of Corrections" was "July 28, 1993," App. 1418–19, and the jury was aware through previous evidence that Petitioner had been released from prison in May 1998.  *See, e.g.*, App. 1296 (Petitioner's letter to police stating, "I got out in May, '98.").

The Court also disagrees with Petitioner's claims that trial counsel failed to fully prepare Aiken for his testimony and that the State exploited Aiken's testimony to introduce additional aggravating evidence such as the specifics of the 1993 ABHAN conviction involving Jackie Williams.  To begin

48

with, the State had already introduced evidence of Petitioner's assault on Williams during its case-in-chief, *see* App. 1146–55, and Aiken's testimony was not the first time this evidence came up. Moreover, Aiken indicated early on in his direct examination that he formed his opinion after reviewing *all* of Petitioner's prison records. App. 1396–97. Sims also drew Aiken's attention to examples of incidents involving violence in prison—including the ABHAN conviction resulting from Petitioner's assault on an inmate—because Sims likely contemplated the State's focusing on such incidents during cross-examination. Of course Sims did not ask about every instance of violence and did not linger too long on this subject, as he took the pragmatic approach of having Aiken confirm that prison officials could adequately manage Petitioner despite his imperfect prison record.

Notably, as discussed in Ground Six above, trial counsel originally planned to present Aiken's testimony in conjunction with evidence of Petitioner's AIDS and deteriorating physical condition to show Petitioner's prior violence in prison would be a non-issue going forward, but Petitioner "absolutely refused" at the last minute to allow trial counsel to present the AIDS evidence.[39] App.

---

[39] The trial record corroborates this fact, as the following occurred during a bench conference with the trial court immediately before the penalty phase:

| MR. SIMS: | Your Honor, I've had an opportunity to have a conversation in regards to certain - - - what we felt to be certain mitigating factors regarding a medical condition of my client. He has informed me that he does not want us to pursue that as a medical condition and as a mitigating circumstance in this matter. And if the Court would inquire of him if that is, in fact, the case. |
|---|---|
| THE COURT: | Mr. Stokes, is that correct? |
| MR. STOKES: | Yes, sir. |
| THE COURT: | You know you have a right to have your attorneys go into that? |
| MR. STOKES: | Yes, I do, I understand. |
| THE COURT: | And you do not want them to do it? |

49

1774–78. Thus, trial counsel were forced to reshuffle their strategy for sentencing, and "[Petitioner]'s recasting of the pros and cons of trial counsel's decision amounts to Monday morning quarterbacking." *Stamper v. Muncie*, 944 F.2d 170, 178 (4th Cir. 1991); *see also Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant."). Notably, Petitioner did not offer his own live testimony to dispute or contradict what Sims discussed with him.

The manner in which trial counsel presented Aiken's testimony—having Aiken focus on Petitioner's adaptability to prison yet still account for Petitioner's history of fighting in prison in anticipation of the State's cross-examination—was objectively reasonable and a "sound trial strategy." *Strickland*, 466 U.S. at 689; *see United States v. Terry*, 366 F.3d 312, 317 (4th Cir. 2004) ("The decision whether to call a defense witness is a strategic decision demanding the assessment and balancing of perceived benefits against perceived risks, and one to which [a court] must afford enormous deference." (internal quotation marks and ellipsis omitted)). Petitioner has not shown trial

---

| | |
|---|---|
| MR. STOKES: | No, sir. Thank you. |
| THE COURT: | Thank you. |
| SOLICITOR: | Your Honor, just to make the record clear, the matter that Mr. Sims was talking about, I think the record should reflect that it was [a] matter of trial strategy and that Mr. Sims wanted to get into that situation but he was unable to do that and his client has been fully informed. |
| MR. SIMS: | Yes, sir. |
| THE COURT: | That's correct. . . .  All right, now, we have on the record the defendant's wish to waive certain submissions on the record concerning mitigating circumstances. |

App. 1085–87.

counsel's presentation of Aiken's testimony regarding prison adaptability "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, and therefore Petitioner has not satisfied the first *Strickland* prong. *See, e.g.*, *Thomas v. Taylor*, 170 F.3d 466, 473 (4th Cir. 1999) ("[B]ecause we find no fault with trial counsel's preparation and presentation of expert [] testimony at sentencing, we reject appellant's [] ineffective assistance claim.").

### b.    Prejudice

Petitioner also fails to show *Strickland* prejudice. First, after being cross-examined, Aiken told the solicitor, "I do not feel intimidated at all," App. 1428, and maintained throughout the entirety of his testimony—both direct and cross—that the Department of Corrections could adequately manage Petitioner in a maximum security environment for the rest of his life. While acknowledging Petitioner's prior history of violence in prison, Aiken still emphasized prison officials could deal with such behavior to reduce the probability of Petitioner assaulting another inmate to a "minuscule" level. Aiken elaborated that prison officials could segregate extremely violent inmates to "a prison within a prison," and even kill an inmate if necessary. App. 1408, 1414. Both Sims and Johnson recalled nearly eighteen years later the powerful effect of such stark testimony.

The fact that Aiken provided mitigating evidence is obvious because the trial court charged the jury as follows:

> A non-statutory mitigating circumstance is one which is not provided for by statute, but is one which serves the same purpose, that is, to reduce the degree of the guilt of the offense or reduce the punishment that should be fairly imposed. **An example of these which you may consider if found in the evidence would include the following, which the defendant asserts and *should be found in the evidence, and that is, the defendant is adaptable to prison.***

App. 1483 (emphasis added). Notably, during its deliberations, the jury sent a note asking the trial court

the following questions: "Define maximum security prison for life in prison without parole. [W]hat privileges does one have? Define maximum security prison for the death penalty. What privileges does one have?"[40] App. 1492. Thus, as reflected by the trial court's instruction and the jury's inquiry, Aiken's opinion regarding prison adaptability operated as a mitigating circumstance considered by the jury. As the Magistrate Judge shrewdly observed: "[w]hile additional aggravating evidence may have come out through Aiken's testimony, his opinion about Petitioner's ability to adapt to prison and the prison's ability to control Petitioner was mitigating." R & R at p. 192.

In sum, Petitioner has not shown a reasonable probability that, but for trial counsel's presentation of Aiken's testimony, the result of sentencing would have been different. *See Strickland*, 466 U.S. at 694–95. Petitioner has therefore not satisfied *Strickland*'s prejudice prong.

### c. Conclusion

The Court finds Petitioner's underlying claim of ineffective assistance of trial counsel is not substantial, and therefore must reject it as procedurally defaulted. *See Martinez*, 566 U.S. at 15–16 ("When faced with the question whether there is cause for an apparent default, a State may answer that the ineffective-assistance-of-trial-counsel claim is insubstantial . . . ."); *see, e.g.*, *Richey v. Cartledge*, 653 F. App'x 178, 186 (4th Cir. 2016) ("Richey's underlying ineffective-assistance claim is . . . not substantial and must be rejected for procedural default.").[41] The Court denies relief on Ground Seven.

### Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order

---

[40]     The trial court answered the question by telling the jury, "The only comment I can make in regard to your inquiry, ladies and gentlemen, is to say this. That you, the jury, must base your decision on the evidence in the record." App. 1492.

[41]     Because the Court finds the underlying claim is insubstantial, it follows that PCR counsel were not ineffective for failing to raise it.

adverse to the applicant." Rule 11(a) of the Rules Governing Section 2254 Cases. A certificate of appealability will not issue absent "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). When the district court denies relief on the merits, a petitioner satisfies this standard by demonstrating that reasonable jurists would find that the court's assessment of the constitutional claims is debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see Miller-El v. Cockrell*, 537 U.S. 322, 336–38 (2003). When the district court denies relief on procedural grounds, the prisoner must demonstrate *both* that the dispositive procedural ruling is debatable, and that the petition states a debatable claim of the denial of a constitutional right. *Slack*, 529 U.S. at 484–85. In this case, the Court concludes that Petitioner has failed to make the requisite showing of "the denial of a constitutional right."

### Conclusion

For the foregoing reasons, the Court overrules Petitioner's objections and adopts the Magistrate Judge's R & R [ECF No. 218] *as modified herein*. Accordingly, the Court **GRANTS** Respondent's motion for summary judgment [ECF No. 160] and **DENIES AND DISMISSES** Petitioner's § 2254 petition in its entirety *with prejudice*. The Court **DENIES** a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**


Florence, South Carolina                                   s/ R. Bryan Harwell
September 28, 2018                                          R. Bryan Harwell
                                                           United States District Judge